**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LUIS VEGA,** | : | **Civil No. 1:11-CV-2015** |
| | : | |
| **Plaintiff,** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **GEORGE RIPLEY, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**REPORT AND RECOMMENDATION**

## I.   Introduction

In this litigation we are called upon to consider the application of the doctrine of qualified immunity, a legal doctrine that plays a central role in civil rights litigation.  This question of qualified immunity arises in the context of a case where police initially arrested the plaintiff, Luis Vega, after the victim of an assault positively identified Vega from a photo line-up as his assailant.  However, following this arrest, police received information which suggested that another man was responsible for this crime.  Independently following up on this information, police identified the actual assailant, arrested that assailant, and dismissed the charges pending against Vega.

We now must determine if police are entitled to qualified immunity when they arrested the man that the victim initially and erroneously alleged shot him.  Under the

qualified immunity doctrine, Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *see also Pearson v. Callahan*, 555 U.S. 223 (2009).   This doctrine provides officials performing discretionary functions not only with a defense to liability, but also with an "immunity from suit." *Crouse v. S. Lebanon Twp.,* 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted).   Qualified immunity:

> balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

*Pearson,* 555 U.S. at 231.

These questions of qualified immunity are presented in the context of a lawsuit brought by the plaintiff, Luis Vega, against the City of York, Pennsylvania ("the City"), the York Police Department ("York PD"); George Ripley, a police detective with the York PD; and John Does 1–10.  In Count I of his complaint Vega makes a claim for malicious prosecution against the individual defendants.  Count II of the

complaint sets forth a *Monell* claim against the City and the York PD, alleging that their policies and practices proximately caused plaintiff's constitutional injuries.[1]

Before the court is a motion for summary judgment filed by the City and George Ripley ("movants"). (Doc. 18.)   The motion has been referred to the undersigned for a report and recommendation, and is now ripe for disposition.   At the outset, it should be noted that Vega does not oppose summary judgment in favor of the City and the York PD on the *Monell* claim.   Thus, the sole remaining issue for disposition is whether summary judgment should be granted as to Count I, the claim against defendant Ripley for malicious prosecution.   Because we believe for the reasons set forth below that defendant Ripley is entitled to qualified immunity from liability for damages in this case, we recommend that this summary judgment motion be granted, and the plaintiff's complaint also be dismissed as to this individual defendant.

## II.    Statement of Facts and of the Case

Viewing the facts in a light most favorable to Vega reveals the following background:   On September 30, 2009, Clarence Collier was shot in the back as he entered his apartment at 675 E. Market Street in York, Pennsylvania. (Docs. 20, 25-3 ¶ 1.)   Collier was severely injured, and was initially paralyzed from the neck down.

---

[1] *Monell v. New York City Dep't of Social Svcs.*, 436 U.S. 658, 690-91 (1978).

3

(*Id*., ¶ 2).  Detective George Ripley was assigned to investigate the matter. (Doc. 20 ¶ 3; Doc. 25-5, Ex. A p. 14:1–5.)  Three nine millimeter shell casings were recovered at the intersection of Lee and Market Streets.  (*Id*. ¶ 5; *id*. 16:1–4.)[2]

At the time of the shooting, Maribel Baez, Collier's girlfriend, told Detective Nicholas Figge that the shooter was a light-skinned black man.  (Docs. 25-2, 26 ¶ 4.) Another person present at the scene, Dan Fulton, told Detective Alan Clarkson that he saw a tall black man running south on Lee Street.  He was wearing a dark hooded top with the hood up.  (*Id*. ¶ 6.)  Baez also stated that she saw a black man running south on Lee Street and that she could identify the shooter.  (*Id*. ¶ 5.)

Ripley spoke with Hannibal Flores at the scene.  Flores described a light-skinned biracial male wearing a black or brown hooded top leaving the intersection where the shooting would have occurred and heading south on Lee Street. (Doc. 25-5, p. 21:2–16.)

Shortly after the investigation began, Ripley received information from Detective Scott Nadzom that an informant had reported that a Luis Vega was bragging about shooting a boy on the east side.  (Doc. 20 ¶¶ 23, 24; Doc. 25-5, p. 30:20–22.)  Ripley thereafter met with this informant, Penny Wright, who stated that her teenage sons had heard that Vega was bragging about shooting someone.  (*Id*. ¶

---

[2] This intersection is near the location of Collier's apartment. (Doc. 20, 25-3 ¶ 1.)

4

27.)   Wright had previously provided police with information that led to drug seizures, arrests and convictions.   (*Id*. ¶ 29.)   Ripley verified that the other information provided by Wright about Vega, *to wit*, his residential history, his vehicle and the fact that he had a sister in Columbia, was accurate.   (*Id*. ¶ 30.)   In examining Vega's background, Ripley learned that he had two firearms registered to him, a .380 and a .40 caliber, but that his license to carry firearms had been suspended in one county.   (*Id*. ¶ 31.)

Ripley testified in his deposition that Baez told him that Collier told her he knew the shooter, Luis, and that Luis had a sister in Colombia.   (Doc. 20 ¶ 32; Doc. 20-1, Ripley Dep. 48:21-49:3.)   Plaintiff denies the veracity of the latter statement because it is not contained in Ripley's investigation report.

Ripley created a photo lineup[3] of six (6) photographs taken from the Pennsylvania Department of Transportation database. (*Id*. ¶¶ 33, 34.) Ripley testified that he selected photographs based on the individual's resemblance to Vega in terms

---

[3] "A 'photo lineup' is an arrangement of photographs of individuals, all with similar physical attributes, shown to a witness to determine whether the suspect can be identified as the perpetrator. The photographs of individuals who are not suspects are chosen based solely on physical characteristics with the intent of including those that most closely match the suspect's attributes . . . [A] 'photo array' is a term that includes any arrangement of photographs for identification purposes[.]" *U.S. v. Barr*, 454 F. Supp. 2d 229, 232 n.1 (E.D. Pa. 2006) (distinguishing a photo lineup from a photo display).

of race and complexion. (*Id*. ¶ 35; Doc. 25-6, p. 51:8–10.) Of the six photographs, Vega's picture has a markedly lighter or brighter blue background when compared to the other photographs. (Doc. 25-8.) Additionally, Vega's photograph is the only one that depicts an individual with facial hair, though the amount of facial hair Vega presents in his photo is minimal, being only a slight mustache and light hair growth on his chin. (*Id*.)

Ripley showed the photo lineup to Collier at the hospital on October 8, 2009. (Docs. 20, 25-3 ¶ 37.)[4] Ripley understood Collier was receiving medication for pain. (*Id*. ¶ 37; Docs. 25-2, 26 ¶ 18.) Collier was awake and alert, but his voice was whisper-like. (Doc. 25-6, p. 53:15–21.) Ripley testified that he explained to Collier why he was there and that Collier stated that he understood. (Doc. 20 ¶ 38; Doc. 25-6, p. 54:6–12.) Ripley further testified that he held the photos for Collier and instructed him that if he identified any of the photographs as the shooter, he should state the number above the picture to identify that individual. (*Id*. ¶ 39; *id*.) Ripley also informed Collier that the photo lineup may or may not include the shooter. (*Id*. ¶ 40.) Ripley also testified that Collier stated that he understood Ripley's instructions. (*Id*. ¶ 41.)

---

[4] Ripley was unsure if the date he presented the photo lineup to Collier was October 7 or October 8. (Doc. 25-6, p. 49:18–20.)

Ripley stated that Collier identified photo number 2. (*Id*. ¶ 42.) Ripley stated that he confirmed this identification by asking Collier if he had identified the person in photo number 2, and that Collier responded "yes." (*Id*. ¶ 47; Doc. 25-6,  p. 54:17–24.) Ripley stated that he asked Collier if he knew the person pictured in photo number 2, and Collier responded affirmatively. (*Id*. ¶ 43.) Ripley testified he also presented this first photo lineup to Baez, but plaintiff denies this was done. (Ripley Dep., Doc. 25-6, p. 62:24–63:6; Doc. 25-3, ¶ 64–67.) Baez was unable to identify the shooter as one of the individuals depicted in the photographs. (Docs. 25-2, 26 ¶ 22.)

Ripley thereafter attempted to gather additional evidence from independent sources. (Doc. 20 ¶ 47; Doc. 25-6, p. 57:15–18.) Vega was subsequently brought to the police station on a separate incident, at which time Ripley interviewed him. (*Id*. ¶ 48.) Vega denied any involvement in the Collier shooting and stated that he was not present in York or residing in York at the time of the shooting. (*Id*. ¶ 50.) Following the interview, Ripley applied for a warrant for Vega's arrest. (*Id*. ¶ 56.) Vega was charged with aggravated assault and carrying a firearm without a license. (*Id*. ¶ 57.)

Subsequently, while investigating a homicide that occurred on May 10, 2010, Ripley interviewed Rashaan Greer. (*Id*. ¶ 59; Doc. 25-5, p. 30:10–16.) In this

7

interview, Ripley became aware of information that led him to believe that Greer was responsible for the Collier shooting.  (*Id*.)

Thereafter, in discussing the shooting, Collier told Ripley that Vega and Greer were both present near the scene at the time of the shooting.  (Doc. 20 ¶ 63.)  Ripley testified that Collier further stated that he saw Greer reach down and motion upward, and as Collier turned towards his apartment, he heard gunshots.  (Doc. 20 ¶ 64.)  Ripley then presented a new photo lineup to Collier in June, 2010.  (Docs. 20, 25-3 ¶¶ 60, 61.)  Collier identified Greer as the person who reached down and motioned upward.  (*Id*. ¶ 65.)  In a separate interview with Baez, Ripley stated that, when presented with the new photo lineup, Baez identified Greer as the shooter.  (Docs. 20, 25-3 ¶ 67.)  She also told Ripley that, prior to seeing the lineup, she was familiar with Greer and she knew who he was.  (*Id*. ¶ 68.)

The charges against Vega were withdrawn and Greer was charged with the shooting of Collier.  (Doc. 20 ¶¶ 69, 70.)

The present action followed.

### III.   Discussion

#### A.   Summary Judgment Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure states that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed R.

Civ. P. 56(a).[5]  A fact is material if its determination might affect the outcome of the

suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248-49 (1986).  A dispute is genuine if "a reasonable jury could return a verdict

for the nonmoving party." *Id.*

Initially, the moving party bears the burden of demonstrating the absence of a

genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The movant meets this burden by pointing to an absence of evidence supporting an

essential element as to which the non-moving party will bear the burden of proof at

trial. *Id.* at 325.

If the moving party carries this initial burden, "the nonmoving party must come

forward with specific facts showing that there is a genuine issue for trial" and do

more than "simply show that there is some metaphysical doubt as to the material

facts." *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011) (citing

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)

(internal quotation marks omitted)).  The nonmoving party cannot rely upon

---

[5] The language of Rule 56 was revised by amendment effective December 1, 2010.
However, "[t]he standard for granting summary judgment remains unchanged,"
and "[t]he amendments will not affect continuing development of the decisional
law construing and applying these phrases." Fed.R.Civ.P. 56 advisory
committee's note to 2010 Amendments.

unsupported allegations in the pleadings. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Further, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

The court must view the facts in a light most favorable to the non-moving party, and the "existence of disputed issues of material fact should be ascertained by resolving 'all inferences, doubts and issues of credibility against the moving party.'" *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (quoting *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)). *See also Anderson*, 477 U.S. at 242. Final credibility determinations on material issues cannot be made in the context of a motion for summary judgment, nor can the court weigh the evidence. *Josey v. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir. 1993); *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993).

At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 251–52. In making this determination, the court must "consider all evidence in the light most favorable to the

party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

### B.   Qualified Immunity Guiding Principles

In order to establish a civil rights claim Vega must show the deprivation of a right secured by the United States Constitution or the laws of the United States. Satisfying these elements alone, however, does not guarantee that Vega is entitled to recover damages from public officials.   Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *see also Pearson v. Callahan*, 555 U.S. 223 (2009).  This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit." *Crouse v. S. Lebanon Twp.*, 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted).  Qualified immunity:

> balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

*Pearson*, 555 U.S. at 231.

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries. First, the court must evaluate whether the defendant violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001), abrogated in part by *Pearson,* 555 U.S. 223; *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007); *Williams v. Bitner*, 455 F.3d 186, 190 (3d Cir. 2006). If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor. *Saucier*, 533 U.S. at 201. If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted. *Pearson*, 555 U.S. at 232; *Saucier,* 533 U.S. at 201-02. The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right. *Williams*, 455 F.3d at 191 (citing *Saucier,* 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." *Wilson*, 526 U.S. at 615. The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has

[not] previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)).  In some cases, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Wilson*, 455 F.3d at 191 (quoting Hope, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially, *Pearson,* 555 U.S. at 239-40, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted.  *Id.* Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity.  *Gruenke v. Seip*, 225 F.3d 290, 299-300 (3d Cir. 2000); *Crouse*, 668 F. Supp. 2d at 671; *see also Grant v. City of Pittsburgh,* 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff)").  Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the

13

law, presents a question of law for the court, and one which can often be resolved on summary judgment. *See Montanez v. Thompson*, 603 F.3d 243 (3d Cir. 2010).

To obtain qualified immunity in a § 1983 action premised on malicious prosecution, a police officer must show his actions were objectively reasonable. *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir.1995). Thus, Ripley must show that a reasonable officer in his situation, aware of the same facts and circumstances, would have probable cause to arrest Vega. *Malley*, 475 U.S. at 344–45; *Orsatti*, 71 F.3d at 483. Put another way, the qualified immunity analysis of a:

> federal false arrest claim turns on whether the detectives' probable cause determination was objectively reasonable. An officer's determination is objectively reasonable if there was "arguable" probable cause at the time of arrest—that is, if "officers of reasonable competence could disagree on whether the probable cause test was met." *Lennon v. Miller,* 66 F.3d 416, 423–24 (2d Cir.1995); *see also Escalera v. Lunn,* 361 F.3d 737, 744 (2d Cir.2004); *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991). "Arguable" probable cause should not be misunderstood to mean "almost" probable cause. The essential inquiry in determining whether qualified immunity is available to an officer accused of false arrest is whether it was objectively reasonable for the officer to conclude that probable cause existed. *See Anderson,* 483 U.S. at 644, 107 S.Ct. 3034; *Saucier,* 533 U.S. at 207, 121 S.Ct. 2151 (section 1983 claims under the Fourth Amendment are evaluated for objective reasonableness).

*Jenkins v. City of New York,* 478 F.3d 76, 87 (2d Cir. 2007).

When this probable cause determination rests upon a victim or witness identification of the alleged perpetrator from a photo line-up, additional

14

considerations come into play.  As a general rule, police who rely upon a photo line-up identification of a suspect to make an arrest are entitled to qualified immunity from damages on a false arrest claim.  *See, e.g.*, *Phillips v. Allen*, 668 F.3d 912, 916 (7th Cir. 2012); *Atterbury v. City Of Miami Police Dep't*, 322 F. App'x 724, 725 (11th Cir. 2009)*; Brown v. Abercrombie*, 151 F. App'x 892, 893 (11th Cir. 2005); *Jernigan v. Richard*, CV-08-2332-PHX-GMS, 2012 WL 79262 (D. Ariz. Jan. 11, 2012); *Garrett v. City of New York*, 10 CIV. 2689 JGK, 2011 WL 4444514 (S.D.N.Y. Sept. 26, 2011); *Roberts v. White*, 698 F. Supp. 2d 457, 459 (D. Del. 2010).  These cases all recognize the commonsense principle that police should be empowered to act when a victim or witness identifies a perpetrator, without having concerns regarding potential civil liability arising out of a mistaken identification paralyzing their efforts. This principle applies, and police are entitled to qualified immunity for arrests arising out of photo line-up identifications, even if in hindsight the photo array may be subject to some criticism as mildly suggestive.  *Phillips v. Allen*, 668 F.3d 912, 916 (7th Cir. 2012).  In short, in this setting good faith mistakes arising out of photo line-up identifications are cloaked with qualified immunity; that qualified immunity is only vitiated if the evidence reveals that police engaged in some deliberate, intentional, wrongful manipulation of a photo line-up resulting in the arrest of an innocent person.  *See  Good v. Curtis*, 601 F.3d 393, 395 (5th Cir. 2010).

1.    **Defendant Ripley is Entitled to Qualified Immunity on Any Claims Arising out of the Photo Array Used in This Case**

Judged against these benchmarks we find that defendant Ripley is entitled to summary judgment in this case on qualified immunity grounds, since his actions did not transgress any clearly established constitutional rights of the plaintiff.  Turning first to Vega's claims based upon what is alleged to have been the unduly suggestive photo array used to initially identify him as a suspect in this shooting, in the Third Circuit, "eyewitness testimony will be permitted unless the pretrial identification procedure was so unnecessarily suggestive as to give rise to a substantial likelihood of irreparable misidentification that admitting the identification testimony would be a denial of due process."  *United States v. Clausen*, 328 F.3d 708, 713 (3d Cir.2003).

An identification procedure, including showing a witness a photo lineup, violates due process only if it "is both (1) unnecessarily suggestive and (2) creates a substantial risk of misidentification...." *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir.2006) (emphasis added)(citing *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977)).

"An identification procedure is impermissibly suggestive when, 'in effect it says to the witness:  This is the man.'" *Evans v. Phelps*, No–10–92–LPS, 2012 WL 1134482 (D. Del. Apr. 2, 2012) (quoting *Foster v. California*, 394 U.S. 440, 443 n. 2, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969)); *see also United States v. Lawrence*, 349

16

F.3d 109, 115 (3d Cir.2003) ("[S]howing a witness a photograph array can constitute a denial of due process when police attempt to emphasize the photograph of a given suspect, or when the circumstances surrounding the array unduly suggest who an identifying witness should select."). Furthermore, a suggestive identification procedure is "unnecessary" if law enforcement does not have "some good reason for the failure to resort to less suggestive procedures." *United States v. Stevens*, 935 F.2d 1380, 1389 (3d Cir.1991). The person challenging the identification procedure has the burden of proving that it was impermissibly suggestive. *Id*. (citing *Reese v. Fulcomer*, 946 F.2d 247, 259 (3d Cir.1991)).

Vega asserts that the photo lineup presented to the victim was unduly suggestive for several reasons. First, Vega submits that the background of his photo was brighter or lighter than the other photos in the lineup. He also contends that his photo was the only one in which an individual had facial hair. Vega argues that these characteristics distinguish his photo from the other and, when coupled with the fact that the Collier was medicated and barely able to talk at the time he identified Vega as the shooter, render the identification process a violation of his due process rights.

In determining whether the use of this particular photo line up violated clearly established case law we must at the outset acknowledge that "[t]here is no constitutional requirement that all photographs contained in an array 'be uniform with

17

respect to a given characteristic.'" *U.S. v. Rogers*, 491 F.Supp.2d 530, 536 (M.D. Pa 2007) (quoting *U.S. v. Stevey*, No. 05-232, 2006 WL 2038614, *4 (W.D. Pa. July 20, 2006) (citing, in turn, *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir.1986)). Even where the defendant's photograph possesses a characteristic that is not present in any other photograph, the array may still pass constitutional muster. *Id*.

As noted above, Ripley testified that he acquired the photos used in the lineup from PennDOT's registration database and that he had no control over the tone of the background in the photos. Movants concede that Vega's photograph is of a different hue than the other five, however, such differences are not necessarily substantial or suggestive and therefore do not constitute a violation of clearly established case law. *See Lawrence*, 349 F.3d at 115 (noting that minor differences in the background color, shading or angle of a defendant's photograph when shown as part of a photographic array are not sufficient to render a pretrial identification unnecessarily suggestive). *United States v. Brudeau*, 168 F.3d 352, 357 (9th Cir.1999)(holding that darker hue to defendant's photograph in array was "insubstantial difference [ ]" that did not create impermissible suggestion that defendant was offender); *United States v. Bautista*, 23 F.3d 726, 731 (2d Cir.1994)(rejecting defendant's claim that a photo array was unnecessarily suggestive because his photograph was "slightly brighter and slightly more closeup than the others" and finding "that these differences did not

18

render the array suggestive"); *Mitchell v. Goldsmith*, 878 F.2d 319, 323 (9th Cir.1989)(holding that various background colors among the photographs did not render lineup unduly suggestive); *U.S. v. Brown*, Crim. No. 06-126, 2006 WL 3041085 (D.N.J. Oct. 26, 2006) (finding that background differences in photo array used to identify defendant was not unnecessarily suggestive).   Nor will racial differences necessarily render a photo array unduly suggestive.   *See Mosby v. Government of Virgin Islands*, No. 1997-0015-1, 2011 WL 4357301, *11 (D.V.I. 2011) (noting that although a photo array displaying persons of markedly different skin tone or ethnicity may be unduly suggestive, the fact that defendant's photograph or complexion appeared slightly darker than the other photographs does not make the array unduly suggestive.); *Reese*, 946 F.2d at 260, *superseded on other grounds by statute*, 28 U.S.C. § 2254(d) ("[P]hotographic displays have been held not unduly suggestive even when certain characteristics of the defendant or his photograph are set apart from the others.").

Similarly, while the fact that Vega's is the only photo depicting an individual with facial hair, such a characteristic could render a photo array overly suggestive if, for example, a witness stated that the suspect had a beard, and only one photo in the array depicted an individual with a beard, there is no evidence that any witness to the shooting remarked about the suspect's facial hair, or lack thereof when they gave

descriptions to the police. It has been held that individuals for a photo array should be chosen "based solely on physical characteristics with the intent of including those that most closely match the suspect's attributes." *U.S. v. Barr*, 454 F.Supp.2d 229, 232 n. 1. (E.D. Pa. 2006). Consequently, while the facial hair characteristic may differentiate Vega's photo from the other photos presented in the lineup, it bears no relevance on the noted attributes of the suspect as detailed by witnesses. Moreover, as noted above, Vega's facial hair is minimal at best, with only a very light mustache and a little hair on his chin depicted. Thus, Vega has not demonstrated that such a feature was  material or even suggestive to his identification by the victim, and has not shown a clear transgression of his rights in this setting. *See U.S. v. Foote*, No. 09-2931, 432 F. App'x. 151 (3d Cir 2011) (finding differences in facial hair amongst photographs in photo array to be negligible and certainly not so striking as to render the array unduly suggestive); *Rogers*, *supra* (noting that, to allow differences in facial hair in photo array, which were minor at best, "to vitiate an otherwise valid pretrial identification procedure would place an undue burden on law enforcement officers 'to search for identical twins in age, height, weight, or facial features' when administering such procedures." (quoting *United States v. Traeger*, 289 F.3d 461, 474 (7th Cir.2002)).

Furthermore, even if Vega had carried his burden of showing that the photo array was unnecessarily suggestive, he must also show under the totality of the circumstances that it gave rise to a substantial likelihood of misidentification amounting to a violation of due process. *Stevens,* 935 F.2d at 1389. "[R]eliability is the linchpin in determining the admissibility of identification testimony...." *Id*. at 1391 (internal quotation marks omitted). The criteria to be considered include:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

In this case Vega challenges Collier's condition at the time he identified Vega as the shooter. Specifically, he asserts that Collier's weakened state, the likelihood that he was receiving medication for pain, and his inability to speak above a whisper were circumstances that created a substantial risk that Collier would identify the wrong person as the shooter. However, Ripley testified that when he went to the hospital approximately one week after the shooting, Collier was awake and alert. Additionally, Ripley specifically informed Collier that the photo array may or may not include a photograph of the shooter. Although Collier was unable to hold the photographs because, at that time, he was paralyzed from the neck down, such a

21

condition did not impact his ability to view the photos which were held for him. Ripley also stated that Collier was able to understand his instructions and, though his voice was low, he was able to identify the photo of Vega and confirm his identification to Ripley.  The identification corroborated Baez's statement to Ripley that Collier knew the shooter to be a person named Luis.

Recognizing that the question of qualified immunity in "federal false arrest claim turns on whether the detectives' probable cause determination was objectively reasonable.   An officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of arrest—that is, if 'officers of reasonable competence could disagree on whether the probable cause test was met.'" *Jenkins v. City of New York,* 478 F.3d 76, 87 (2d Cir. 2007).  In this case, we find that defendant Ripley could reasonably rely on the eyewitness photo line-up identification to conclude that probable cause existed, and that his actions are therefore cloaked with qualified immunity.  *See e.g.*, *Phillips v. Allen*, 668 F.3d 912, 916 (7th Cir. 2012); *Atterbury v. City Of Miami Police Dep't*, 322 F. App'x 724, 725 (11th Cir. 2009)*; Brown v. Abercrombie*, 151 F. App'x 892, 893 (11th Cir. 2005); *Jernigan v. Richard*, CV-08-2332-PHX-GMS, 2012 WL 79262 (D. Ariz. Jan. 11, 2012); *Garrett v. City of New York*, 10 CIV. 2689 JGK, 2011 WL 4444514 (S.D.N.Y. Sept. 26, 2011); *Roberts v. White*, 698 F. Supp. 2d 457, 459 (D. Del. 2010).  Under the totality of these

circumstances, we conclude that Ripley is entitled to qualified immunity because the photo identification procedure used here did not violate clearly established legal norms and create a clear and substantial risk of misidentification.  Given that Ripley found Collier coherent and informed him that the suspect's photo may not be in the lineup, Vega  has not proven that the identification was unreliable.  Since Vega has failed to establish this element of a constitutional claim, Ripley is entitled to summary judgment on this issue.

### 2.   Ripley is also Entitled to Qualified Immunity on Any Malicious Prosecution Claim

Furthermore, defendant Ridley is also entitled to qualified immunity on any malicious prosecution claims leveled by Vega.  In this specific factual setting, not only did Vega fail to show a violation of his clearly established rights, he failed to establish all of the essential elements of a malicious prosecution claim.  Under 42 U.S.C. §1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Section 1983 imposes civil liability upon any person who, under color of state law, deprives someone of the rights, privileges, or immunities secured by the federal Constitution or the laws of the United States. *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000).   Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989).   To establish a Section 1983 claim, therefore, a plaintiff "must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation [violation of a right] was committed by a person acting under the color of state law." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

A Fourth Amendment claim of malicious prosecution under §1983 requires proof of five elements:

(1)     the defendant initiated a criminal proceeding;

(2)     the criminal proceeding ended in his favor;

(3)     the defendant initiated the proceeding without probable cause;

(4)     the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and

(5)     the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*Dice v. Johnson*, 711 F. Supp. 2d 340, 364–65 (M.D. Pa. 2010) (Caldwell, J.) (quoting *Johnson v. Knorr*, 477 F.3d 75, 81–82 (3d Cir. 2007)).

Movants contend that Vega is unable to establish all elements of a *prima facie* case of malicious prosecution.  The parties do not dispute that Vega can establish the second element — that the proceedings ended in his favor when, in June 2010, all charges against him were dismissed.  Nor is there any dispute as to the fifth element — that Vega suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding by being placed under arrest.  Whether Vega can demonstrate the first, third and fourth elements of a malicious prosecution claim is disputed.

### (1)    Initiation of criminal proceedings

"In most cases, 'a prosecutor rather than a police officer initiates a criminal prosecution.'"  *Zeglen v. Miller*, No. 04–1940, 2008 WL 696940, *8 (M.D. Pa. Mar.12, 2008) (quoting *Houston v. City of Phila.*, No. 05–CV–372, 2007 U.S. Dist. LEXIS 40026, at *20 (E.D. Pa. May 31, 2001)); *Harris v. City of Phila.*, No. 97–3666, 1998 WL 481061, at *5 (E.D. Pa. Aug.14, 1998) ("In most circumstances, a plaintiff can not proceed against a police officer for a claim of malicious prosecution because a prosecutor, not a police officer, 'initiates' criminal proceedings

against an individual.").[6]   A plaintiff can proceed against a police officer for malicious prosecution only if the officer "fails to disclose exculpatory evidence to prosecutors, makes false or misleading reports to the prosecutor, omits material information from the reports, or otherwise interferes with the prosecutor's ability to exercise independent judgment in deciding whether to prosecute." *Zeglen*, 2008 WL 696940, *8 (quoting *Telepo v. Palmer Twp.*, 40 F. Supp.2d 596, 610 (E.D. Pa.1999)); *Harris v. Jacobs*, No. 11-4685, 2012 WL 4109052 * 6 (E.D. Pa. Sept. 19, 2012) (A malicious prosecution claim against a police officer can proceed if the plaintiff can show that the officer "fail[ed] to disclose exculpatory evidence to prosecutors, ma[de] false or misleading reports to the prosecutor, omit[ted] material information from the reports, or otherwise interfere[d] with the prosecutor's ability to exercise independent judgment in deciding whether to prosecute.") (citations omitted).

While Vega makes no allegation that Ripley withheld evidence from prosecutors, made false or misleading reports to prosecutors or otherwise interfered with the prosecutor's ability to exercise independent in deciding whether to prosecute

_____

[6] Unlike federal law, Pennsylvania does not limit malicious prosecution claims to prosecutors. *Milbourne v. Baker*, No. 11-CV-1866, 2012 WL 1889148, *12 (E.D. Pa. May 23, 2012).  Rather, a plaintiff may bring a malicious prosecution claim against the police officer who arrested or cited plaintiff and referred plaintiff's case to prosecutors. *Id. (citing Neczypor v. Jacobs*, 403 Pa. 303, 169 A.2d 528 (Pa.1961)).

the case, he does aver that Ripley's affidavit omitted material facts.  Specifically, Vega contends that the affidavit fails to include facts relating to the victim's condition at the time he was presented with the photo lineup; fails to include characteristics of Vega's photo that differentiated it from others in the photo lineup; and provides no information on how Vega was first identified as the shooter.

In order for such information to establish the first element of a malicious prosecution claim by demonstrating that Ripley omitted information from his report, such information must be material.  As noted above, however, Collier's condition at the time he was presented the photo lineup is of no consequence as Ripley stated that he was alert and able to follow instructions and respond to questions.  Moreover, the fact that Ripley compiled the lineup based on their resemblance to Vega's complexion and race, a detailed description of each photograph in the array is immaterial to the report.  Finally, while Ripley omitted the fact that he first learned Vega may be a suspect from an informant, who had proven to be reliable in the past as she had previously provided police information that led to convictions, this fact was referenced in the probable cause affidavit.  (Doc. 20-15.)  Thus, it has not been omitted but rather was disclosed in the investigative file.  Moreover, it cannot reasonably be argued that, had such information been included in his report, prosecutors would have taken different action in bringing charges against Vega.

Accordingly, Vega has failed to establish the first element of a prima facie case of malicious prosecution.

### (2)   *Probable cause to arrest*

Probable cause is established upon the facts and circumstances available to the arresting officer at the time of arrest. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). *See also Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir.1993) ("Probable cause is proof of facts and circumstances that would convince a reasonable, honest individual that the suspected person is guilty of a criminal offense."). Pennsylvania law governs the validity of the arrest in this case. *U.S. v. Myers*, 308 F.3d 251, 255 (3d Cir.2002). Under Pennsylvania law, "probable cause exists where the officer has knowledge of sufficient facts and circumstances to warrant a prudent person to believe" that the suspect has committed the crime. *Commonwealth v. Welshans*, 580 A.2d 379, 381, 397 Pa. Super. 439 (Pa. Super. Ct.1990), *aff'd*, 605 A.2d 1222, 529 Pa. 571 (Pa.1992). "[T]he evidentiary standard for probable cause is significantly lower than the standard which is required for conviction." *Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005)(citing *Michigan v. DeFillippo*, 443 U.S. 31, 36, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979)). Because an arrest is made with probable cause if at the moment it was made the facts and circumstances within the officer's knowledge "were sufficient to warrant a

prudent man in believing that [the suspect] had committed or was committing an offense," *Beck v. Ohio*, 379 U.S. 89, 91 (1964), the constitutional validity of an arrest does not turn on whether the suspect ***actually*** committed any crime, Johnson v. Campbell, 332 F.3d 199, 211 (3d Cir. 2003).  Thus, "[t]he determination that probable cause exists is fundamentally a factual analysis that must be performed by officers at the scene.  It is the function of the court to determine whether the objective facts available to the officers at the time of arrest were sufficient to justify a reasonable belief that an offense was being committed."  *United States v. Glasser*, 750 F.2d 1197, 1206 (3d Cir. 1984).  Although officers on the scene may draw inferences and make deductions that might elude an untrained person, *United States v. Cortez*, 449 U.S. 411, 418 (1981), "an officer's inferences and deductions can only justify a[n] arrest if the government satisfies its burden of establishing the probable cause necessary to support the arrest,"  *Myers,* 308 F.3d at 255.

Where a police officer possesses "knowledge of a credible eyewitness ... a reasonable jury could not find that [he] lacked knowledge of sufficient facts to establish probable cause to arrest."  *Merkle*, 211 F.3d at 790.  A positive identification by a victim witness may usually be sufficient to establish probable cause. *Wilson v. Russo*, 212 F.3d 781, 790 (3d Cir. 2000).  However, this precept is qualified, and "[i]ndependent exculpatory evidence or substantial evidence of the

witness's own unreliability that is known by the arresting officers could outweigh the identification such that probable cause would not exist." *Id*. Furthermore, courts have repeatedly held that reliance on a photo line-up identification of an alleged perpetrator by a victim or eyewitness provides police with probable cause, that quantum of proof that is necessary to defeat a false arrest claim. *See e.g.*, *Phillips v. Allen*, 668 F.3d 912, 916 (7th Cir. 2012); *Atterbury v. City Of Miami Police Dep't*, 322 F. App'x 724, 725 (11th Cir. 2009)*; Brown v. Abercrombie*, 151 F. App'x 892, 893 (11th Cir. 2005); *Jernigan v. Richard*, CV-08-2332-PHX-GMS, 2012 WL 79262 (D. Ariz. Jan. 11, 2012); *Garrett v. City of New York*, 10 CIV. 2689 JGK, 2011 WL 4444514 (S.D.N.Y. Sept. 26, 2011); *Roberts v. White*, 698 F. Supp. 2d 457, 459 (D. Del. 2010).

Here, Ripley testified that Collier both identified Vega's photograph as the shooter and also affirmed that he knew the person in the photograph he identified as the shooter. Collier's identification of Vega as the shooter was not unreliable as Ripley found him to alert and able to follow instructions and respond to questions. Ripley additionally stated that Baez had previously informed him that Collier knew the shooter to be a "Luis" who had a sister in Columbia. Vega has not identified any evidence that Ripley had any reason to doubt Collier's identification, and Vega

himself testified that he does not believe that Ripley had any reason to doubt the information provided by Wright.

Moreover, the fact that the weapons registered to Vega were a .380 and a .40, but the shell casing found at the scene case was from a 9 mm is of not exculpatory inasmuch as it was possible that Vega was in the possession of another firearm which was not registered to him. Vega also maintains that he stated he was not in York at the time of the shooting. Such a statement is self-serving. This information was not verified through independent sources and thus is not exculpatory evidence which negates a probable cause finding.

The facts and circumstances within the Ripley's knowledge at the time he prepared the affidavit are sufficient in themselves to warrant a reasonable person to believe that an offense had been committed by Vega. Under the totality of the circumstances, even when viewed in the light most favorable to Vega, probable cause existed to arrest him for the shooting based on the victim's identification of him as the shooter, and the information from the informant that Vega was bragging about the shooting. Vega cannot establish that defendants lacked probable cause to initiate proceedings against him. Consequently, he has failed to establish the third element of a prima facie case of malicious prosecution.

### (3)     *Malice*

With respect to the fourth element of a malicious prosecution claim, malice, Ripley contends that there is no evidence that he acted maliciously or for a purpose other than bringing Vega to justice.  "Actual malice in the context of malicious prosecution is defined as either ill will in the sense of spite, lack of belief by the actor himself in the propriety of the prosecution, or its use for an extraneous improper purpose."  *Lee v. Mihalich*, 847 F.2d 66, 70 (3d Cir.1988).  "Malice may be inferred from the absence of probable cause."  *Lippay*, 996 F.2d at 1502.

Vega contends an improper motive is evidenced by Ripley's failure to present the photo lineup to Baez.  However, Ripley testified that he did, in fact, present the photo lineup to Baez, but that she was unable to identify any of the photos as the shooter.  Vega also asserts that Baez stated that the shooter was a black male, and Ripley was aware that Vega was a Hispanic male.  However, Vega has not identified when Ripley stated that he knew of Vega's ethnic background.  The witnesses to the shooting described the suspect as both a light-skinned black man and as a biracial man.  (*See* Doc, 20-6, Ex. B, p. 2, 3.)[7]

---

[7] Moreover, "Hispanic" refers not to race or skin color but describes ethnicity and culture and may appear white, black or otherwise.  *U.S. v. Hare*, 308 F. Supp. 2d 955, 379 n.13 (D. Neb. 2004).

Finally, Vega's own testimony also supports a conclusion that Ripley's motives were not malicious.  Vega testified that he did not believe that Ripley knowingly accused him of a crime he did not commit but that Ripley was merely acting on the information he received from Wright. (Doc. 20-11, Ex. D.4, p. 81:16–22.) Vega also testified that he did not believe that Ripley knew that the information provided by Wright was false.  (*Id*. 81:23–82:5.)  Additionally, Ripley testified that he believed Wright's information as well as Collier's identification to be reliable.  Although he himself had not used Wright as an informant in the past, Ripley knew other officers who had used information she provided, which resulted in successful prosecutions. Additionally, as noted above, at the time Collier was present the photo lineup, Ripley found him to be alert and able to both follow his instructions and respond to his questions.

Further, there are no allegations of spite or use of the arrest and attendant prosecution process for any purpose other than justice.  Thus the fourth element of a malicious prosecution claim has not been clearly established, and Vega having failed to establish all factors of a malicious prosecution claim, summary judgment in favor of Ridley is warranted here.

In sum, in October of 2009, Detective Ripley was presented with a compelling set of circumstances:  a near-fatal shooting by an assailant who was at large.  When

33

the victim of the assault identified Luis Vega as his assailant from a photo line-up,

Ripley possessed probable cause and had a responsibility to act upon this information.

Yet, defendant Ripley continued to pursue this matter, even after initially identifying

Vega as the shooter in this incident.  That dogged pursuit of the truth by defendant

Ripley ultimately exonerated Vega, and simply does not at this time provide any

grounds for civil liability on behalf of the detective.

## III.   <u>Recommendation</u>

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the

defendants' motion for summary judgment (Doc.  18.) be GRANTED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings,
> recommendations or report addressing a motion or matter described in
> 28 U.S.C.  § 636 (b)(1)(B) or making a recommendation for the
> disposition of a prisoner case or a habeas corpus petition within fourteen
> (14) days after being served with a copy thereof. Such party shall file
> with the clerk of court, and serve on the magistrate judge and all parties,
> written objections which shall specifically identify the portions of the
> proposed findings, recommendations or report to which objection is
> made and the basis for such objections. The briefing requirements set
> forth in Local Rule 72.2 shall apply. A judge shall make a de novo
> determination of those portions of the report or specified proposed
> findings or recommendations to which objection is made and may
> accept, reject, or modify, in whole or in part, the findings or
> recommendations made by the magistrate judge. The judge, however,
> need conduct a new hearing only in his or her discretion or where
> required by law, and may consider the record developed before the
> magistrate judge, making his or her own determination on the basis of
> that record. The judge may also receive further evidence, recall

witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 15th day of May 2013.

***<u>S/Martin C. Carlson</u>***
Martin C. Carlson
United States Magistrate Judge
